Peco Company v. Commissioner.
Peco Co. v. Commissioner
Docket No. 908-66.
United States Tax Court
T.C. Memo 1967-41; 1967 Tax Ct. Memo LEXIS 220; 26 T.C.M. (CCH) 207; T.C.M. (RIA) 67041; March 2, 1967
Peter Meloy, 555 Fuller Ave., Box 1699, Helena, Mont., John R. Kline, and J. Patrick Giblin, for the petitioner. Lee A. Kamp, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's income taxes for the fiscal years ended October 31, 1962, and October 31, 1963, in the respective amounts of $763.22 and $200.26. The primary issue presented for our decision is whether advances by stockholders to petitioner-corporation were capital contributions, thus making purported interest payments a return on capital, or whether they were bona fide loans, thus making the purported interest payments allowable deductions under section 163, Internal Revenue Code *221 of 1954. If we find that payments on the advances were interest, two secondary issues must be considered: (1) Whether any amounts were actually paid to those parties holding the promissory notes in the years before us; and (2) if such amounts were actually paid, whether the petitioner-corporation could deduct them for its fiscal year ended October 31, 1962, when the checks were written, or for its fiscal year ended October 31, 1963, when the checks were cashed. Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Peco Company, Inc. (hereinafter referred to as petitioner or Peco), is a Montana corporation doing business in that State. It filed its Federal corporate income tax returns for the fiscal years ended October 31, 1962, and October 31, 1963, with the district director of internal revenue at Helena, Montana. E. J. and Mae W. Palmquist (hereinafter referred to as E. J. and Mae) are husband and wife residing at Helena, Montana. E. E. Palmquist (hereinafter referred to as Buzz) is the son of E. J. by a prior marriage. He is engaged in the business of electrical *222 contracting and retail sales of electrical appliances and materials under the name of Palmquist Electric Company in Helena, Montana. In August 1959, prior to the incorporation of Peco, E. J. and Buzz employed an architect to prepare plans for an apartment building on property located on the corner of Benton and Hauser Avenues in Helena, Montana. That property was owned by E. J. and Mae as tenants in common. The project was intended to be a family affair, the construction costs, income and expenses to be shared on a 50-50 basis with Buzz having a half interest and E. J. and Mae the other half interest. There was no intent to form a corporation at that time. The construction of the apartment building was divided into three components: the general construction, the mechanical construction, and the electrical work. Requests for bids were made by E. J. and Buzz. The general construction of the apartment building was awarded on the low bid of $92,748 to Wohlberg Construction Company of Helena, and the mechanical construction contract was awarded on the low bid of $22,663 to Reber Plumbing and Heating Company of Helena. Both contracts were signed in October 1959 by E. J. and Buzz. Construction *223 began immediately thereafter. The electrical work was not submitted on a bid, but was eventually completed by Palmquist Electric Company at a cost of $15,111.49. On the advice of their accountant, E. J., Mae and Buzz decided to incorporate the apartment building. On December 28, 1959, Peco Company was organized with E. J., Mae and Buzz as its shareholder-subscribers and only directors. On December 31, 1959, at its first meeting, the board of directors accepted an offer by E. J. to convey the Benton Avenue real property to the corporation in exchange for the issuance of 100 shares of stock to E. J. and 900 shares to Mae. Concurrently, it accepted an offer by Buzz to do $10,000 worth of electrical contracting work on the proposed apartment building construction in exchange for 1,000 shares of corporate stock. It also authorized the borrowing of $100,000 from the Home Building and Loan Association (hereinafter called Loan Association) in Helena, the loan to be secured by a first mortgage on the realty and buildings thereon. In addition, the board of directors authorized the borrowing of $20,072.50 each from E. J. and Buzz and the issuance of promissory notes in such amounts. The identical *224 promissory notes to E. J. and Buzz, dated January 1, 1960, provided as follows: For value received, one year from the date hereof the maker hereof will pay to E. J. [Buzz] PALMQUIST or his order the sum of $20,072.50 together with interest at the rate of 4% per annum. Provided, however, the maker shall have the option of extending this note from year to year but not to exceed 20 years and in the event suit is necessary to collect this note the maker will pay reasonable costs and attorneys' fees incident to the collection hereof. Prior to and at the time of incorporation E. J. and Buzz each made the following cash advances, totaling $20,072.50, to petitioner which were used for construction costs on the apartment building: E. E. (Buzz)
Date
E. J. Palmquist
Palmquist
10/19/59
$10,000.00
10/19/59
72.50
$ 72.50
10/20/59
5,170.64
12/ 7/59
14,829.36
1/ 6/60
10,000.00
Total
$20,072.50
$20,072.50
On or about January 7, 1960, Peco borrowed $81,000 at 5 1/2 percent interest with monthly payments of $880 from the Loan Association. This was secured by a first mortgage on the apartment building. Approximately one-half of the balance outstanding *225 on this mortgage was transferred to the Commerce Bank and Trust Company in Helena (hereinafter called Commerce Bank). The outstanding balance was then retransferred from Commerce Bank to the Loan Association in December 1961. On August 11, 1960, Peco borrowed an additional $4,000 from the Loan Association. This loan was secured by a second mortgage on the apartment property and required monthly payments of $43.42. On October 26, 1964, Peco borrowed another $6,300 from the Loan Association. This loan was secured by a third mortgage on the apartment property and required monthly payments of $50. Thus the total monthly mortgage payments stemming from these three loans from the Loan Association were about $973.42 until December 1964 when they were reduced to $675 per month. Loan Association could not loan an amount on the apartment building greater than 75 percent of the construction costs. At the time petitioner obtained from the Loan Association the $81,000 loan, the Loan Association was not advised of the two outstanding promissory notes to E. J. and Buzz. Also, this loan was made although the construction contracts with Wohlberg Construction and Reber Plumbing and Heating were *226 never assigned by E. J. and Buzz to Peco. Although the promissory notes to E. J. and Buzz were prior in time to the mortgages from the Loan Association, they were unsecured and were thus subordinate to the bank loans but not to general creditors. In applying for the $81,000 loan from the Loan Association, the petitioner stated that it anticipated monthly revenue of $1,290. Actual gross rents for its first four fiscal years were as follows: Fiscal Year
Amount
10-31-60
$ 3,474.00
10-31-61
14,190.00
10-31-62
16,330.00
10-31-63
15,467.50
The ten-unit apartment building was completed on about July 1, 1960. The total construction costs, which exceeded estimated construction costs by approximately $14,210, were as follows: Land
$ 10,612.75
Building and improvements (includ-
ing parking lot paving)
132,915.32
Furniture and fixtures
6,705.93
Total
$150,234.00
The deductions taken by Peco on its corporate income tax returns for operating the apartment house during its first four fiscal years were as follows: 10/31/60
10/31/61
10/31/62
10/31/63
Insurance
$ 377.48
$ 506.02
$ 562.10
$ 562.10
Interest and bank charges
2,071.06
4,588.64
7,449.11
3,721.87
Janitor - supplies
186.15
443.61
520.46
483.67
Utilities
136.80
996.22
988.11
899.15
Property taxes
1,065.23
2,061.98
2,134.34
2,570.92
Repairs
18.67
319.87
516.54
Advertising
43.52
90.30
Legal and accounting
330.00
200.00
175.00
Filing fees
4.00
Sundry
6.00
6.25
Total before depreciation and amortization
$3,836.72
$ 8,992.66
$12,179.99
$ 9,025.80
Depreciation
1,349.71
4,032.24
4,049.67
4,049.67
Amortization of organization costs
70.75
84.90
84.90
84.90
Total deductions
$5,257.18
$13,109.80
$16,314.56
$13,160.37
*227 On October 31, 1962, Peco drew two checks on its account in the Commerce Bank, each in the amount of $1,605.80 and payable to E. J. and Buzz, respectively. They were for purported interest due from January 1, 1960, to January 1, 1962, on the 4 percent promissory notes issued to E. J. and Buzz. When these checks were drawn, Peco's checking account showed a balance of $1,687.16. Outstanding checks on that date, including the two checks mentioned above, totaled $4,033.73, leaving a reconciled overdraft of $2,346.57 on that account. The above two checks, each in the amount of $1,605.80, were not paid until October 31, 1963. On that same date E. J. and Buzz loaned identical amounts to petitioner. As of November 1, 1963, Peco's books showed loan balances of $1,605.80 and $9,267.51 payable to E. J. and Buzz, respectively. These were reduced to 4 percent promissory notes. The note for $1,605.80 resulted from interest purportedly paid to E. J. on October 31, 1962. The note for $9,267.51 payable to Buzz reflected the balance of $5,111.49 for building materials supplied by Buzz on October 19, 1959, the $1,759.13 paid by Buzz on October 31, 1961, to Helena Sand and Gravel for paving, and the *228 $1,605.80 of interest purportedly paid to him on October 31, 1962. On October 27, 1964, petitioner drew two checks, each in the amount of $1,605.80 and payable to E. J. and Buzz, respectively. These checks represented purported interest due on the 4 percent promissory notes from January 1, 1962, to January 1, 1964. These checks were cashed by E. J. and Buzz on October 27 and 28, 1964, respectively, and the proceeds were not returned to petitioner. On October 30, 1964, petitioner wrote checks in the amount of $802.90 each to E. J. and Buzz. These checks represented purported interest payments on the promissory notes from January 1, 1964, to January 1, 1965. The checks were both cashed on December 6, 1966. These amounts were not loaned back to Peco. At the time Peco acquired the construction loans from the Loan Association and Commerce Bank, E. J. was president and a director of the Loan Association and a director of Commerce Bank. On January 7, 1960, E. J. submitted a statement to the Loan Association that he owned one-twelfth of the outstanding capital stock of Peco. [1]
*229 Loan Association is a building and loan association organized and operated under the laws of the State of Montana, and insured by the Federal Savings and Loan Insurance Corporation. Paragraph 545.6-8 of the "Rules and Regulations For The Federal Savings and Loan System" provides that no real estate loan shall be made to a corporation of which a director or officer of a Federal association owns more than 15 percent of the outstanding stock. Section 7-113.1 Revised Codes of Montana 1947, as amended, provides that Montana building and loan associations insured by the Federal Savings and Loan Insurance Corporation cannot make real estate loans exceeding the authority granted to savings and loan associations chartered by the United States. Thus the Loan Association could not make a loan to petitioner if E. J's ownership of petitioner's stock exceeded 15 percent of its total stock issued. In his notice of deficiency the respondent determined that an interest deduction in the amount of $3,211.60 was not allowable in the fiscal year ended October 31, 1962. As a result of that adjustment, the net operating loss carryover deduction from the year ended October 31, 1960, to the year ended *230 October 31, 1962, was increased in the amount of $667.54. A net operating loss carryover deduction in the same amount ($667.54) claimed for the year ended October 31, 1963, was disallowed in that year. Ultimate Findings 1. The advances by E. J. and Buzz Palmquist prior to and at the time of Peco's incorporation were equity investments placed at the risk of the business. 2. Peco did not pay any interest on indebtedness to its stockholders, E. J. and Buzz Palmquist, during its fiscal years ended October 31, 1962, and October 31, 1963. Opinion Section 163(a), Internal Revenue Code of 1954, permits a deduction for all interest paid or accrued within the taxable year on "indebtedness." The issue here is whether the "promissory notes" which form the controverted subject matter of this proceeding represent a bona fide "indebtedness." Petitioner maintains that E. J. and Buzz each loaned to it $20,072.50 and received one year promissory notes, extendable by the corporation for up to 20 years with interest payable at 4 percent, thus creating a bona fide debtor-creditor relationship. Therefore, petitioner argues that it is entitled to deductions under section *231 163(a) for interest payments made to E. J. and Buzz on such promissory notes. Respondent counters with the contention that the advances made to petitioner prior to its incorporation were equity capital and that the purported interest payments were not paid on a genuine indebtedness of the corporation. Hence, it is his position that the payments to E. J. and Buzz are not deductible as interest under section 163(a). Several criteria have been applied by the courts in determining whether amounts advanced to a corporation constitute debt or contributions to capital. At least 11 separate factors have been used. They are: (1)
the names given to the certificates
evidencing the indebtedness;
(2)
the presence or absence of a maturity
date;
(3)
the source of the payments;
(4)
the right to enforce the payment of
principal and interest;
(5)
participation in management;
(6)
a status equal to or inferior to that
of regular corporate creditors;
(7)
the intent of the parties;
(8)
"thin" or adequate capitalization;
(9)
identity of interest between creditor
and stockholder;
(10)
payment of interest only out of
"dividend" money;
(11)
the ability of the corporation to ob-
tain loans from outside lending in-
stitutions.
*232 See Montclair, Inc. v. Commissioner, 318 F. 2d 38 (C.A. 5, 1963); O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court; and Wilbur Security Company v. Commissioner, 279 F. 2d 657 (C.A. 9, 1960), affirming 31 T.C. 938 (1959). No single factor controls and, of course, each case must be decided on its particular facts. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). Here our consideration of all relevant factors convinces us that the advances made by E. J. and Buzz to Peco Company were contributions to capital. Our ultimate findings of fact reflect this conclusion. In the first place, while the advances were reduced to a "promissory note," such a formality and appellation cannot be permitted to outweigh other factors to the contrary. Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956); R. M. Gunn, 25 T.C. 424 (1955). The notes in question had a maturity date, apparently one year, but the due date could be extended by petitioner at its option from year to year up to a maximum of *233 20 years. Leaving the right to postpone payment on a note solely at the option of its maker without any limitations is, to say the least, highly unusual and creates a strong inference that the parties to it contemplated no fixed maturity date. The advances were originally made by E. J. and Buzz before Peco's incorporation in order to cover initial construction costs of the apartment building. As such, they were sums placed at the risk of a "family venture" and in no way represented debt. Upon the incorporation of petitioner, E. J. and Buzz decided that these sums should be treated as debt rather than equity. However, sums previously placed at the risk of a business cannot suddenly be transmuted into debts not at the risk of that business by the mere act of incorporation, particularly when used to create the primary asset of the corporation. Cf. Sam Schnitzer, 13 T.C. 43, 61 (1949), affirmed per curiam 183 F. 2d 70 (C.A. 9, 1950). When the organizers of a new enterprise designate as loans a substantial amount of money they lay out in order to get the business established and under way, a strong inference arises that such sums are contributions to the corporation's *234 capital. Cf. Isidor Dobkin, 15 T.C. 31 (1950), affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951). The "promissory notes" stated on their face that "in the event suit is necessary to collect this note the maker will pay reasonable costs and attorneys' fees incident to the collection hereof." The notes also provided for interest of 4 percent per annum. Although these provisions indicate some intent by the parties that the notes were to be enforceable, both as to principal and interest, the petitioner could delay the payment of principal for up to 20 years thus rendering almost meaningless the rights of the holders to enforce their payment without incurring legal costs. Furthermore, the payment of interest was sporadic during petitioner's first four years of existence and the purported interest payments for the first two years appear to us as mere paper shuffling. We recognize that the "promissory notes" gave E. J. and Buzz no voting rights or a right to participate in petitioner's management. But this has no relevance since Buzz already owned 50 percent of petitioner's outstanding stock and E. J., with Mae's shares being attributed to him, owned the other *235 50 percent. And both were already officers of Peco. In view of the fact that both of them already had voting rights and participated in the management of the corporation, any additional voting rights under the "promissory notes" would only have served to maintain the 50-50 balance between them. Peco points out that E. J. and Buzz, as holders of the "promissory notes," had a status equal to that of its general corporate creditors since the notes were not subordinated to such claims. However, this does not strike us as important since the three loans from the Loan Association were secured by first, second, and third mortgages on the apartment building and the notes issued to E. J. and Buzz were unsecured and subordinate to the mortgages. Yet the notes were issued prior to the mortgages. Moreover, the record shows that petitioner did not even mention the existence of the promissory notes to E. J. and Buzz in making application for the first mortgage of $81,000 from the Loan Association in January 1960. This indicates an intent to subordinate the advances made by E. J. and Buzz to those of other large creditors, even though such intent was not specifically expressed on the notes themselves *236 and the subordination was inchoate. Petitioner stresses that its intent, as reflected by the language of its "promissory notes" and the other relevant factors, was to borrow money from E. J. and Buzz. But the record discloses that the purpose for calling the advances debt instead of equity was that E. J. could not own more than 15 percent of petitioner's stock if it desired to obtain a loan from the Loan Association. The mere fact that State law put the parties in a position where they had to characterize the advances as "debt" for a particular business purpose does not control their real nature for Federal tax purposes. To be sure, the desire of the parties to label the advances as "debt" is outweighed by other considerations which persuade us that the advances were simply "a participation in the pot luck of the enterprise." Aqualane Shores, Inc. v. Commissioner, 269 F. 2d 116 (C.A. 5, 1959), affirming 30 T.C. 519 (1958). At the time of its incorporation the petitioner listed capital contributions of $20,000. This consisted of land worth $10,000 contributed by E. J. and the $10,000 in services to be performed by Buzz. Including both the purported loans *237 from E. J. and Buzz and the first mortgage from the Loan Association, the petitioner had debts of $121,145 at the time of incorporation. While a debt to equity ratio of 6 to 1 is by no means conclusive, it is nonetheless sufficiently substantial that it cannot be completely ignored in these circumstances. See Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957). E. J. and Buzz are shareholders of petitioner as well as purported creditors. Both testified as to their intention to run the corporation together on a 50-50 basis. Since the shares of stock owned by Mae are attributable to E. J., the advances to the corporation from E. J. and Buzz were in virtually the same ratio as their stock holdings. This factor weighs against calling the advances debt. See Schnitzer v. Commissioner, supra; Arlington Park Jockey Club v. Sauber, 262 F. 2d 902 (C.A. 7, 1959). It is clear that the purported interest payments were not made out of "dividend" money because the petitioner has made very little profit since its apartments were first rented and E. J. and Buzz have continually loaned it money to meet current obligations. Indeed, we think it is questionable whether the *238 purported interest payments were ever paid. When the checks were written in October 1962, the petitioner did not have sufficient funds in its checking account to cover their payment. When they were cashed a year later, the recipients, E. J. and Buzz, immediately loaned back to petitioner exactly the same amounts. In view of the illusory nature of these transactions, the fact that the purported payments were not made out of petitioner's "dividend" money does little to further its cause. Moreover, we think there was a lack of reasonable expectation of repayment. E. J. testified that the Loan Association would loan Peco a maximum of 75 percent of its construction costs. He also testified that Peco did not try to obtain loans from any other outside sources. It seems doubtful to us whether additional funds could have been obtained from outside investors in view of the debt structure of Peco and its anticipated earnings. Accordingly, we conclude from a consideration of all the facts, as well as the authorities urged by both parties, that the advances made to petitioner by E. J. and Buzz were in the nature of equity rather than debt and we so hold. This conclusion makes it unnecessary *239 for us to consider the secondary issues as to whether the payments were in fact made and, if so, the year in which the deduction should be taken. Decision will be entered for the respondent. Footnotes
1. It appears that E. J. owned one-twentieth of the outstanding capital stock of Peco since 100 shares were issued to him out of the 2,000 shares issued (100 to E. J., 900 to Mae, and 1,000 to Buzz).↩