WILBUR SECURITY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68408.   Filed January 30, 1959.

*Francis J. Butler, Esq.*, and *Paul Castoldi, Esq.*, for the petitioner.
*George E. Constable, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioner's income taxes as follows:

| Year | Deficiency |
| --- | --- |
| 1953 | $13, 957. 26 |
| 1954 | 17, 254. 17 |
| 1955 | 17, 254. 18 |

The issues are (1) whether the amounts outstanding in petitioner's bills payable account, upon which disbursements as interest expense were made during the years involved, constitute bona fide indebtedness of the corporation or whether, in reality, such amounts constitute equity capital invested in petitioner's business; and (2) whether petitioner failed to report interest income in the amount of $840 on its income and excess profits tax return for 1953.

#### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

Petitioner, the Wilbur Security Company, hereinafter referred to as the company, is a Washington corporation with its principal office located in the city of Wilbur, Washington.  Its corporation income and excess profits tax return for the calendar year 1953 and its corporation income tax returns for the calendar years 1954 and 1955 were timely filed with the district director of internal revenue at Tacoma, Washington.

In 1915, the city of Wilbur, Washington, a small community of less than 1,100 population, was serviced by a single bank, the Wilbur State Bank, hereinafter referred to as the bank.  The stockholders

of the bank had a large amount of money on deposit with the bank. The stockholders considered that the existence of such large deposits might attract other banking concerns to the city of Wilbur. To forestall such competition from developing, the stockholders of the bank formed the company on March 18, 1915. A further purpose of the formation of the company was to provide an entity which would serve and hold such of the bank's customers as required long-term loans that the bank, under existing restrictions, could not carry.

As originally constituted, the company's articles of incorporation provided in part as follows:

### ARTICLE TWO.

The objects for which this corporation are formed are:

\*  \*  \*  \*  \*  \*  \*

3. To charge and collect interest upon money loaned, invested or otherwise handled by it, and to derive profit upon any and all transactions by it, and to collect any share of any profit, result or property involved in any contract or transaction relating to its business.

\*  \*  \*  \*  \*  \*  \*

5. In all ways in its own right, to purchase, acquire, manage, develope, operate, improve, change, exchange, mortgage, lease, pledge, hypothecate, sell and dispose or [sic] properties and interests of all kinds, whether real, personal or mixed and wheresoever situate.

6. To take, acquire, purchase, own, sell, lease, exchange, pledge, mortgage, hypothecate, grant, improve and otherwise deal in real estate, townsites and divisions, lots or subdivisions thereof, and to issue evidences of interest, title, or right in any such property, either in its own right or its rights under contract.

\*  \*  \*  \*  \*  \*  \*

9. To borrow or raise money upon all bonds, warrants, debentures, investment certificates and other negotiable or transferable instruments, or otherwise, as directed by the board of trustees.

10. To lend money or other property on its own account and to receive notes, obligations and evidences therefor, and conveyances, hypothecations and pledges as security for its repayment or redelivery of the same.

\*  \*  \*  \*  \*  \*  \*

### ARTICLE THREE.

The capital stock of this corporation shall be Twenty-five thousand ($25,000.00) Dollars, divided into Two Hundred Fifty (250) shares of the par value of One hundred ($100.00) dollars per share.

\*  \*  \*  \*  \*  \*  \*

### ARTICLE SIX.

The number of trustees of this corporation shall be five and the names and residences of the first trustees who shall manage the affairs of the corporation until the 1st day of July 1915, are J. McPherson, E. L. Farnsworth, Chas. Hudkins, G. Thompson, and E. H. Oswalt, all of Wilbur, Lincoln County, state of Washington.

### ARTICLE SEVEN.

The capital stock of this corporation may be transferred without restriction to any person already a stockholder therein, but shall not be transferable to any person or party not a stockholder of this company without the affirmative vote, approving such transfer, of at least two-thirds of the capital stock of this company, at a regular or special stockholders' meeting called for that purpose. In case any stockholder desires to sell all or part of the stock held by him to a person not already a stockholder of this company, he shall notify the secretary of this company in writing, stating the amount of stock he desires to sell and the price asked, and shall attach his stock certificate to such notice and give the name and address of the prospective purchaser, the secretary shall then notify all of the other stockholders of this company, and such stockholders shall have an option on said stock at the price asked for thirty days following such notice. If none of said stockholders shall exercise their right of option at or before the expiration of said thirty days, the secretary of this company shall call a stockholders meeting in the manner provided in the by-laws for the purpose of voting upon such prospective purchaser and in case he shall be elected to become a stockholder of this corporation, the president and secretary thereof shall endorse upon such certificate of stock, under the seal of this corporation, using the form given in Article Eight herein, the fact that such prospective purchaser, naming him, has been duly elected to become a stockholder of this company, and such certificate shall then be returned. In case such prospective purchaser shall not be elected as herein provided, then said certificate shall be returned without such indorsement.

### ARTICLE EIGHT.

On every certificate of stock issued by this company, the following provision shall be printed thereon, to wit:

According to Article VII of the Articles of Incorporation of this company and an agreement entered into between the holder of this certificate and all the other stockholders of this company, this certificate is not transferable until the stockholders of this company have been given an option for thirty days for the purchase thereof and such option expired, nor can this certificate be transferred, except to the stockholders of this company, without the consent of at least two-thirds of the capital stock voted in this company, which consent shall be endorsed hereon and signed by the president and secretary of this corporation, naming the person to whom same may be transferred, and bearing the corporate seal.

The following individuals were the original incorporators of the company and subscribers of the 250 shares of $100-par-value stock authorized by the company's articles of incorporation in the number of shares and amounts indicated:

| Subscriber | Number of shares | Amount |
|---|---|---|
| E. L. Farnsworth | 120 | $12,000 |
| John McPherson | 105 | 10,500 |
| Charles Hudkins | 10 | 1,000 |
| G. Thompson | 10 | 1,000 |
| E. H. Oswalt | 5 | 500 |

None of this stock was actually paid for or issued at this time. Petitioner's incorporators subscribed to petitioner's stock in proportion to their stock interests in the bank.

On April 5, 1915, petitioner's subscribers held a special meeting at which time they each advanced amounts of money to petitioner as "deposits" and adopted the following amendment to the bylaws regarding the aforesaid deposits:

Amendment No. 1.

Article XII.

The Several stockholder of the Wilbur Security Company having this day deposited with the Company the following amounts;

| | | |
|---|---:|---:|
| E. L. Farnsworth | $96,000.00 | |
| J. McPherson | 84,000.00 | |
| Chas. Hudkins | 8,000.00 | |
| G. Thompson | 8,000.00 | |
| E. H. Oswalt | 4,000.00 | $200,000.00 |

Which sums are to be credited to each Stockholders "Special Stockholders Account" on the books of the Company. These accounts not to be withdrawn by any of said stockholders except by consent of two-thirds of the Capital Stock voted in this Company at any regular or special stockholders meeting.

When any stockholder sells any of his stock it is understood that $800.00 of his "Special Stockholders Account" shall be transferred with each share of stock sold and the proper officer shall make the transfer on the books of the Company at the time the stock is transferred.

This bylaw has never been amended by the corporation.

The $200,000 advanced to petitioner on April 5, 1915, by its subscribers had been on open account in the bank to the credit of each subscriber. Upon its advance to the petitioner, this amount was immediately redeposited by it in the bank.

On December 28, 1916, the petitioner's board of directors held a special meeting at which time it was decided to set aside $25,000 of petitioner's earnings as paid-in capital. At the same meeting, it was decided to issue stock certificates to the original subscribers thereof. The minutes of the meeting were as follows:

Special meeting of the Trustees of Wilbur Security Company held this day and called to order by J McPherson President at 3:00 P.M. All directors present. The following resolution was offered and unanimously adopted;—

Whereas the earnings of this Company are in excess of Twenty five thousand dollars:

1st Dividend. Therefore be it resolved that $25,000.00 be set aside as the fully paid capital stock of this Company and that certificates of stock be issued to the several stockholders as a stock dividend as follows:

| | |
|---|---:|
| E. L. Farnsworth | 115 shares |
| J McPherson | 105 shares |
| Chas Hudkins | 10 shares |
| G. Thompson | 10 shares |
| EH Oswalt | 5 shares |
| M E Hay | 5 shares |
| Total | 250 shares |

Meeting adjourned.

From 1915 to 1938, the special stockholders' account totaled $200,000 in each year and the paid-in capital account totaled $25,000 in each year, representing 250 shares of $100-par-value stock, the only outstanding stock. However, the individual interests in those accounts fluctuated during the period 1915–1938 as follows (the dollar value of the interest in the special stockholders' account appearing first after the year, followed immediately by the number of shares of capital stock):

| Year | E. L. Farnsworth | J. McPherson | Elizabeth McPherson | Chas. Hudkins | A. Alexander | G. Thompson | E. Oswalt | M. E. Hay |
|---|---|---|---|---|---|---|---|---|
| 1915 | $96,000-120 | $84,000-105 | ---------- | $8,000-10 | ---------- | $8,000-10 | $4,000-5 | ---------- |
| 1916 | 92,000-115 | 84,000-105 | ---------- | 8,000-10 | ---------- | 8,000-10 | 4,000-5 | $4,000-5 |
| 1917 | 92,000-115 | 80,000-100 | ---------- | 12,000-15 | ---------- | 8,000-10 | 4,000-5 | 4,000-5 |
| 1918 | 92,000-115 | 80,000-100 | ---------- | 12,000-15 | ---------- | 8,000-10 | 4,000-5 | 4,000-5 |
| 1919 | 60,000-75 | 80,000-100 | ---------- | 24,000-30 | $4,000-5 | 16,000-20 | 12,000-15 | 4,000-5 |
| 1920 | 60,000-75 | 80,000-100 | ---------- | 24,000-30 | 4,000-5 | 16,000-20 | 12,000-15 | 4,000-5 |
| 1921 | 64,000-80 | 80,000-100 | ---------- | 24,000-30 | ---------- | 16,000-20 | 12,000-15 | 4,000-5 |
| 1922 | 72,000-90 | 80,000-100 | $4,000-5 | 24,000-30 | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1923 | 76,000-95 | 80,000-100 | 4,000-5 | 20,000-25 | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1924 | 76,000-95 | 80,000-100 | 4,000-5 | 20,000-25 | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1925 | 76,000-95 | 80,000-100 | 4,000-5 | 20,000-25 | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1926 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1927 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1928 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1929 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1930 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1931 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1932 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1933 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1934 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1935 | 76,000-95 | 100,000-125 | 4,000-5 | ---------- | ---------- | 16,000-20 | 4,000-5 | -------- |
| 1936 | 72,000-90 | 102,000-127½ | 4,000-5 | ---------- | ---------- | 16,000-20 | 6,000-7½ | -------- |
| 1937 | 72,000-90 | 102,000-127½ | 4,000-5 | ---------- | ---------- | 16,000-20 | 6,000-7½ | -------- |
| 1938 | 72,000-90 | 102,000-127½ | 4,000-5 | ---------- | ---------- | 16,000-20 | 6,000-7½ | -------- |

In addition to the $200,000 in the special stockholders' account, petitioner received various additional sums from 1915 through 1938. These amounts were received from the original subscribers, from stockholders and from nonstockholders. In every case, however, such nonstockholders were members of the immediate families of stockholders. The accumulation of these amounts and their source during the years 1915 to 1938 were as follows:

| Year | E. L. Farnsworth | Grace Phillips | J. McPherson | Kate McPherson | Julia McPherson | D. K. McPherson |
|------|------|------|------|------|------|------|
| 1915 | $15,000.00 | | | | | $50,000 |
| 1916 | 25,000.00 | | $4,000.00 | | | 50,000 |
| 1917 | 40,000.00 | | 4,000.00 | | | ¹ 70,000 |
| 1918 | 61,000.00 | $4,933.15 | 13,000.00 | $36,000.00 | $36,000.00 | |
| 1919 | 95,0C0.00 | 6,568.98 | 25,000.00 | 28,500.00 | 23,900.00 | |
| 1920 | 114,950.00 | 11,515.46 | 34,000.00 | 21,000.00 | 25,900.00 | |
| 1921 | 108,000.00 | 13,835.16 | 58,000.00 | 34,581.12 | 63,500.00 | |
| 1922 | 107,000.00 | 14,994.26 | 52,500.00 | 31,000.00 | 53,000.00 | |
| 1923 | 110,000.00 | 21,224.56 | 61,000.00 | 35,000.00 | 58,500.00 | |
| 1924 | 95,500.00 | 20,000.00 | 66,000.00 | 38,000.00 | 61,000.00 | |
| 1925 | 89,000.00 | 20,000.00 | 69,000.00 | 43,000.00 | 64,000.00 | |
| 1926 | 102,000.00 | 10,000.00 | 55,000.00 | 47,000.00 | 69,000.00 | |
| 1927 | 98,000.00 | | 55,000.00 | 50,500.00 | 69,000.00 | |
| 1928 | 90,000.00 | | 64,750.00 | 54,500.C0 | 73,000.00 | |
| 1929 | 90,000.00 | | 66,000.00 | 57,500.00 | 75,000.00 | |
| 1930 | 100,679.35 | | 72,722.65 | 75,388.30 | 97,753.70 | |
| 1931 | 104,000.00 | | 72,700.00 | 74,700.00 | 98,100.00 | |
| 1932 | 104,000.00 | | 74,100.00 | 74,300.00 | 97,220.00 | |
| 1933 | 103,800.00 | | 72,950.00 | 74,200.00 | 96,970.00 | |
| 1934 | 102,600.00 | | 69,950.00 | 74,050.00 | 95,790.00 | |
| 1935 | 100,944.05 | | 66,000.00 | 74,050.00 | 95,390.00 | |
| 1936 | 88,141.55 | 10,000.00 | 64,000.00 | 74,050.00 | 95,390.00 | |
| 1937 | 87,890.55 | | 64,200.00 | 78,050.00 | 96,390.00 | |
| 1938 | 97,790.55 | | 78,000.00 | 81,050.00 | 99,390.00 | |

¹ Transferred to the following from estate:

| | |
|---|---|
| J. McPherson | $3,000 |
| Kate McPherson | 33,500 |
| Julia McPherson | 33,500 |
| | 70,000 |

Nonstockholders did not participate in management or in voting for petitioner's officers. The $200,000 in the special stockholders' account, the $25,000 in the paid-in capital account, and the moneys in the special account were invested in loans upon notes and mortgages, primarily upon real estate, in which the bank was unable to invest. When some of the obligors could not meet the payments on the notes and mortgages, petitioner acquired title to the properties which had been held as the security for the loans. As a result petitioner acquired title to the following properties:

| Description | Date acquired | Acreage |
|---|---|---|
| Alexander farm | 1929 to 1933 | 2,781 |
| Cameron farm | 1933 | 627 |
| Edd Campbell farm | 1932 | 547 |
| Grinstead farm | 1933 | 158 |
| Hagen farm | 1933 | 315 |
| John Hansen farm | 1932 | 470 |
| B. L. Harris farm | 1932 | 1,098 |
| F. A. Hudkins farm | 1932 | 145 |
| Frank Nelson farm | 1931 and 1932 | 938 |
| O'Shaughnessy farm | 1932 | 478 |
| Osterkamp farm | 1935 | 1,579 |
| Smith-Draper farm | {1932 / 1953} less sale {474 / 20} | 454 |
| V. Sommers farm | 1933 | 359 |
| V. Sommers farm | 1931 and 1932 | 621 |
| E. A. Squire farm | 1933 | 79 |
| E. A. Squire farm | 1932 | 1,157 |
| R. S. Stauffer pasture land | 1933 | 742 |

The combined book value of these farms was from $437,039.41 to $445,594.72, whereas the fair market value of the properties was estimated to be in excess of $1,500,000 during the years in question. The operation of these farms constituted petitioner's principal source of income.

Petitioner's surplus, dividends, salaries, interest paid on obligations not in issue, and amounts paid on the special account and special stockholders' account from 1915 through 1938 were as follows:

| Year | Surplus | Dividends | Salaries | Interest paid on obligations not in issue | Amounts paid on special account and special stockholders' account |
|---|---|---|---|---|---|
| 1915 | $5,058.53 | (¹) | (¹) | (¹) | $388.77 |
| 1916 | 2,228.81 | $25,000 | (¹) | (¹) | 3,701.45 |
| 1917 | 728.69 | 18,000 | $7,840 | (¹) | 4,837.56 |
| 1918 | 105.43 | 20,000 | 6,480 | $100.00 | 6,279.20 |
| 1919 | 792.46 | 17,500 | 4,400 | 1,335.72 | 7,714.30 |
| 1920 | 1,876.19 | 7,500 | 4,400 | 8,253.93 | 8,770.00 |
| 1921 | 19,122.53 | (¹) | 2,400 | 4,993.09 | 12,645.40 |
| 1922 | 18,142.34 | (¹) | 4,675 | 654.60 | 13,341.60 |
| 1923 | 18,422.58 | (¹) | (¹) | 623.67 | 14,902.19 |
| 1924 | 17,855.34 | (¹) | (¹) | 118.68 | 12,595.15 |
| 1925 | 17,384.09 | 2,500 | (¹) | 150.00 | 13,255.67 |
| 1926 | 21,542.22 | 5,000 | (¹) | 1,348.42 | 13,339.12 |
| 1927 | 36,219.85 | (¹) | (¹) | 475.00 | 13,684.36 |
| 1928 | 48,901.34 | (¹) | (¹) | (¹) | 12,552.66 |
| 1929 | 49,969.10 | (¹) | (¹) | 570.87 | 12,841.30 |
| 1930 | 53,776.75 | (¹) | (¹) | 3,152.70 | 13,044.00 |
| 1931 | 53,063.90 | (¹) | (¹) | 1,831.88 | 5,607.93 |
| 1932 | 49,636.64 | (¹) | (¹) | 1,984.60 | (¹) |
| 1933 | 49,486.08 | (¹) | (¹) | 387.33 | (¹) |
| 1934 | 48,861.34 | (¹) | (¹) | 80.83 | (¹) |
| 1935 | 47,689.40 | (¹) | (¹) | (¹) | (¹) |
| 1936 | 48,675.20 | (¹) | (¹) | (¹) | (¹) |
| 1937 | 48,685.46 | 12,500 | 2,200 | 1,172.38 | 15,760.00 |
| 1938 | 48,687.22 | 9,585 | (¹) | (¹) | 16,428.00 |

None.

In 1939, petitioner's income tax returns for 1937 and 1938 were examined by respondent and a deficiency in income tax was proposed for that year on the basis of a disallowance of the interest deduction taken for the interest paid to the stockholders on the amounts in the special stockholders' account. Petitioner filed a protest to the proposed determination and a subsequent agreement was reached whereby the tax returns were accepted as correct.

On June 5, 1939, a special meeting of petitioner's stockholders was held in which a resolution was adopted. The minutes of the meeting were, in part, as follows:

It was duly moved, seconded and carried unanimously that the STOCK-HOLDERS ACCOUNTS on books of Wilbur Security Company, which total $200,000.00 shall be paid off and distributed to the owners thereof, viz:

J. McPherson, Stockholders Account _____ $102,000.00

E. L. Farnsworth, Stockholders Account _____ $ 72,000.00

G. Thompson, Stockholders Account _____ $ 16,000.00

E. H. Oswalt, Stockholders Account _____ $ 6,000.00

Elizabeth McPherson, Stockholders Account _____ $ 4,000.00

$200,000.00

and further, that the Secretary of Wilbur Security Company, G. Thompson, is hereby directed and empowered to pay off and distribute the said Stockholders Accounts to the owners thereof.

The $200,000 was withdrawn from the special stockholders' account and the same amount was redeposited with the other funds in the special account. This transaction was accomplished by bookkeeping entries without transferring cash between petitioner and the stockholders. From this time on, only stockholders and members of the immediate families of stockholders held interests in the special account.

On January 20, 1943, petitioner's board of directors passed a resolution which provided, in part, as follows:

It was duly moved, seconded and carried that all our Special Accounts Payable, on which we pay interest, shall be changed over to BILLS PAYABLE, as of January 1, 1943. That the Secretary shall prepare proper notes of the Wilbur Security Company for each of said Special Accounts Payable, dating same January 1, 1943, due one year after date, and bearing interest at rate of 5 per cent per annum. That, these said Bills Payable shall be signed for the Company by the its [sic] President and attested by its Secretary.

Following this action, the secretary prepared bills payable to the respective holders of interests (who were all stockholders or members of their immediate families) in the new bills payable account, to pay 5 per cent interest for 1 year. At the end of each year thereafter, up to 1955, petitioner's directors renewed these bills to pay a specified rate of interest or canceled the old notes and issued new notes for the same amounts without approval from those nonstockholders who held interest in the bills payable account. The directors endeavored to fix the interest rate annually so that it would be slightly above that of the prevailing rate paid by lending institutions. At the same time, in fixing the annual interest rate, the directors took into account the petitioner's earnings. The notes remained in petitioner's possession at all times and none of the nonstockholders ever saw them, although some knew of them.

The notes executed for 1952, on December 31, 1951, were originally issued to provide for 5 per cent interest per annum. On November 4, 1952, the board of directors increased this interest rate to 6 per cent. In 1956 the nomenclature of this account was changed to "Notes Payable" at the advice of Laurence D. Morse, the certified public accountant who handled the books of petitioner, because the term "Bills Payable" was deemed to be old fashioned.

The status of the bills payable account from 1939 to 1955 and a comparison of that account to the stock account for those years were as follows:

| Year | E. L. Farnsworth | Sarah A. Farnsworth | Grace Phillips | J. McPherson | G. Thompson |
|---|---|---|---|---|---|
| 1939 | $169,790.55-90 | ---------------- | ---------------- | $190,000-122½ | $16,000-20 |
| 1940 | 157,790.55-90 | ---------------- | ---------------- | 187,000-122½ | 16,000-20 |
| 1941 | 81,081.47 | $73,096.74-90 | ---------------- | 171,000-102½ | 16,000-20 |
| 1942 | ---------------- | 99,829.80-90 | $44,298.60 | 144,000-102½ | 16,000-20 |
| 1943 | ---------------- | 96,829.80-90 | 50,298.60 | 144,000-102½ | 16,000-20 |
| 1944 | ---------------- | 93,829.80-90 | 53,298.60 | 144,000-102½ | 16,000-20 |
| 1945 | ---------------- | 90,829.80-90 | 56,298.60 | 144,000-102½ | 16,000-20 |
| 1946 | ---------------- | 75,829.80-90 | 71,298.60 | 144,000-102½ | 16,000-20 |
| 1947 | ---------------- | 72,829.80-90 | 74,298.60 | 144,000-102½ | 16,000-20 |
| 1948 | ---------------- | 69,829.80-90 | 77,298.60 | 144,000-102½ | 16,000-20 |
| 1949 | ---------------- | 66,829.80-90 | 80,298.60 | 144,000-102½ | 16,000-20 |
| 1950 | ---------------- | 63,829.80-90 | 83,298.60 | 144,000-102½ | 16,000-20 |
| 1951 | ---------------- | 63,829.80-90 | 83,298.60 | 144,000-102½ | 16,000-20 |
| 1952 | ---------------- | 63,829.80-90 | 83,298.60 | 144,000-102½ | 16,000-20 |
| 1953 | ---------------- | 63,829.80-90 | 83,298.60 | 144,000-102½ | 16,000-20 |
| 1954 | ---------------- | 63,829.80-90 | 83,298.60 | 144,000-102½ | 16,000-20 |
| 1955 | ---------------- | ---------------- | 147,128.40-90 | 144,000-102½ | 16,000-20 |

| Year | E. H. Oswalt | Elizabeth McPherson | J. K. McPherson | Kate McPherson | Julia McPherson | Catherine Bernhard |
|---|---|---|---|---|---|---|
| 1939 | $6,000-7½ | $4,000-5 | $8,000-5 | $87,000 | $99,390 | ------------ |
| 1940 | 6,000-7½ | 4,000-5 | 8,000-5 | 87,000 | 99,390 | ------------ |
| 1941 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | ------------ |
| 1942 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | $25,000 |
| 1943 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1944 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1945 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1946 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1947 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1948 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1949 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1950 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1951 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1952 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1953 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1954 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |
| 1955 | 6,000-7½ | 4,000-5 | 24,000-25 | 87,000 | 99,390 | 25,000 |

The moneys in the Grace Phillips account prior to 1940 were deposited there for her by E. L. Farnsworth, her father, who took care of her finances. In 1940, E. L. Farnsworth died and his stock, plus an amount in excess of $800 per share, was then transferred to the account of Sarah A. Farnsworth, his widow. Of the remaining funds left in the special account to the account of E. L. Farnsworth, approximately $69,000 was used to pay inheritance taxes. Sarah A. Farnsworth died in 1951. Her stock and interest in the then bills payable account were held under that name until 1954 when they were transferred to the account of Grace Phillips, her daughter. On January 1, 1953, petitioner disbursed $14,000 to Grace Phillips, as executrix of the estate of Sarah A. Farnsworth, for the purpose of settling that estate. No book entry was made affecting the balance in the bills payable account, or any other account. However, the interest payment on the bills payable account was arrived at by subtracting the $14,000 from the bills payable account and computing the interest on the difference. The total of bills payable for the year was also shown as the gross amount undiminished by the $14,000 on the balance sheet, but the minutes of the directors meeting and the 1953 tax return reflect both the gross amount and the net amount

in that account. The $14,000 was redeposited with petitioner on January 4 and 12, 1954, by Grace Phillips to the credit of the estate.

The relationship .between stockholders, and between stockholders and those owning interests in the bills payable account was as follows:

D. K. McPherson
J. McPherson, son of D. K. McPherson
Kate McPherson, daughter of D. K. McPherson
Julia McPherson, daughter of D. K. McPherson
Elizabeth McPherson, wife of J. McPherson
J. K. McPherson, son of J. McPherson
Catherine Bernhard, daughter of J. McPherson
E. L. Farnsworth
Sarah A. Farnsworth, wife of E. L. Farnsworth
Grace L. Phillips, daughter of E. L. Farnsworth

The members of the McPherson and Farnsworth families have maintained a close, friendly relationship through the years.

From 1941 to 1955 the members of the board of trustees (or directors) consisted of five of the stockholders, as provided for by the bylaws. These were:

John McPherson                    Godfrey Thompson
John K. McPherson                 Grace L. Phillips
E. H. Oswalt

Petitioner's officers from 1941 to 1955 were as follows:

John McPherson, president
J. K. McPherson, vice president
Godfrey Thompson, secretary

Petitioner's surplus, dividends, salaries, interest paid on obligations not in issue, and interest paid on the special account or bills payable account from 1939 through 1955 were as follows:

| Year | Surplus | Dividends | Salaries | Interest paid on obligations not in issue | Amounts paid on special account or bills payable account |
|---|---|---|---|---|---|
| 1939 | $51,367.39 | $5,000 | (1) | (1) | $17,016.90 |
| 1940 | 52,734.52 | 7,500 | (1) | (1) | 17,195.40 |
| 1941 | 56,741.77 | 7,500 | (1) | $203.33 | 21,559.50 |
| 1942 | 75,819.90 | 7,500 | $5,000 | 162.90 | 27,475.92 |
| 1943 | 69,140.93 | 7,500 | 5,000 | (1) | 27,596.75 |
| 1944 | 73,864.99 | 7,500 | 5,000 | (1) | 27,625.92 |
| 1945 | 79,082.44 | 7,500 | 5,000 | (1) | 27,625.92 |
| 1946 | 84,553.48 | 25,000 | 8,000 | (1) | 27,625.92 |
| 1947 | 98,158.21 | 25,000 | 12,000 | (1) | 27,625.92 |
| 1948 | 105,328.30 | 25,000 | 18,000 | (1) | 27,625.92 |
| 1949 | 109,838.21 | 25,000 | 18,000 | (1) | 27,625.92 |
| 1950 | 128,977.48 | 25,000 | 18,000 | (1) | 27,625.92 |
| 1951 | 129,107.95 | 25,000 | 18,000 | (1) | 27,625.92 |
| 1952 | 147,238.25 | 25,000 | 18,000 | (1) | 33,151.10 |
| 1953 | 147,541.62 | 25,000 | 18,000 | (1) | 32,311.10 |
| 1954 | 164,121.39 | 25,000 | 18,000 | (1) | 33,151.10 |
| 1955 | 166,872.50 | 25,000 | 18,000 | (1) | 33,151.10 |

1 None.

Petitioner's balance sheet for the years in question was as follows:

| | 1953 | 1954 | 1955 |
|---|---|---|---|
| *Assets* | | | |
| Current assets: | | | |
| Cash in bank | $2,315.55 | $54,938.74 | $35,119.82 |
| Bills receivable | 304,095.73 | 269,161.64 | 283,176.36 |
| Investment in stocks | 500.00 | 500.00 | 500.00 |
| Fixed assets: | | | |
| Farm properties and buildings | 438,148.74 | 437,039.41 | 445,594.72 |
| Total assets | 745,060.02 | 761,639.79 | 764,390.90 |
| *Liabilities and capital* | | | |
| Current liabilities: | | | |
| Income tax payable, estimated | 20,000.00 | 20,000.00 | 20,000.00 |
| Notes payable | 552,518.40 | 552,518.40 | 552,518.40 |
| Capital: | | | |
| Capital stock | 25,000.00 | 25,000.00 | 25,000.00 |
| Surplus | 147,541.62 | 164,121.39 | 166,872.50 |
| Total liabilities and capital | 745,060.02 | 761,639.79 | 764,390.90 |

Respondent disallowed all interest deductions for moneys paid as interest on the bills payable account when he determined that the account represented the actual invested capital, placed at the risk of the enterprise. Also the amount of $840 was added to petitioner's income for 1953 representing 6 per cent interest on the $14,000, which was reported as an account receivable from the estate of Sarah A. Farnsworth.

The amounts outstanding in petitioner's bills payable account constitute equity capital invested in the petitioner's business. The payments of $32,311.10 in 1953, $33,151.10 in 1954, and $33,151.10 in 1955 on the bills payable account were distributions of dividends.

Petitioner did not realize $840 in interest income in 1953.

OPINION.

*Issue 1.*

Whether amounts advanced to a corporation constitute equity capital or indebtedness is a question of fact, and the issue must be decided on the facts of each individual case. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1946). Under the decided cases, some of the determining factors have been the name given to the certificates evidencing the indebtedness, the presence or absence of a maturity date, the source of the payments, the right to enforce the payment of principal and interest, participation in management, a status equal to or inferior to that of regular corporate creditors, the intent of the parties, capitalization, identity of interest between creditor and stockholder, and payment of interest only out of dividends. See *Gooding Amusement Co.*, 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957) ; *Isidor Dobkin*, 15 T.C. 31 (1950) ; *Green Bay & Western Railroad Co.*, 3 T.C.

372 (1944), affd. 147 F. 2d 585 (C.A. 7, 1945); and *John Kelley Co.*, 1 T.C. 457 (1943), revd. 146 F. 2d 466 (C.A. 7, 1944), revd. 326 U.S. 521 (1946). It is the petitioner's contention that a consideration of the above-listed factors as they existed during the years before us, 1951–1953, leads to the conclusion that a bona fide indebtedness existed. On the other hand, respondent maintains that giving proper consideration and weight to all material facts and circumstances, including those of years prior to the tax years, will require a contrary result. We agree with respondent.

Looking only to the facts of the years in question, without regard to the circumstances of prior years, the bills payable account might appear to be a bona fide indebtedness. For each account, there existed a note, bearing a stated rate of interest, and payable at a fixed maturity date, 1 year from the date of making the note. The ownership of the stock did not continue in the same proportion to the interests in the bills payable account. Some persons owning interests in the bills payable account did not own any stock, nor did they have any right to vote or participate in the management. The names on the certificates, bills payable, suggest an indebtedness rather than capital investment. Finally, the declared intent of the petitioner as set out in the minutes of the directors meetings would suggest the existence of an indebtedness. However, we are satisfied that to accord determinative weight to these apparent indicia of an indebtedness without consideration of the events and circumstances of prior years, where material, would distort the true facts and obscure the reality of the arrangement here involved.

In 1915, when the corporation was first formed, the only funds petitioner possessed with which it could conduct its business was the $200,000 advanced by the subscribers to the stock. No other property or capital was advanced to it. No stock was issued or paid for in 1915. This same $200,000 was part of the bills payable account during the years here involved, 1953–1955. On April 5, 1915, the bylaws were amended whereby the stockholders were required to have $800 in the special stockholders' account (now part of the bills payable account) for each share of stock owned by them. It was not until 1916 that the subscribed stock was in fact issued, and this subscribed stock was paid for from the first year's earnings of the business. During that year, only the $200,000 was available and at the risk of the business so that we may conclude that the stock was paid for out of earnings on the $200,000. In 1916, a "stock dividend" was declared in the amount the $25,000 (the same amount as that of the original, unpaid-for stock subscriptions) and this $25,000 was then set aside as the paid-in capital on the company books. Thus, it is obvious from these circumstances that the $25,000 in reality represented earned surplus rather than actual paid-in capital. The orig-

inal $200,000 remained the sole risk capital of the enterprise. The ratio of the stated capital of $25,000 to the so-called special stockholders' account of $200,000 was 8 to 1, a fact indicative that the entire $200,000 was at the risk of the business. See *R. M. Gunn*, 25 T.C. 424 (1955), affd. 244 F. 2d 408 (C.A. 10, 1957), certiorari denied 355 U.S. 830 (1957); and *Gooding Amusement Co., supra*. In the first years of petitioner's existence, there was no written evidence of the alleged indebtedness, no obligation to pay interest, no maturity date, no right to enforce payment of interest or principal, and there was an absolute proportionate interest between stock and the special stockholders' account, required by the bylaws, which continued through 1939.

The $200,000 had been withdrawn originally from the bank for the purpose of using it to make long-term loans, which the bank could not make because of loan restrictions. Petitioner also argues that the stockholders originally withdrew the $200,000 from the bank because the presence of the large deposit on hand at the bank would lure other competing banks into the small community. However, once the money was withdrawn from the bank and advanced to petitioner, it was immediately redeposited in the bank to the account of petitioner. In view of this circumstance, it is difficult to find much substance in the argument.

Under all the circumstances of this case, we are satisfied that there was no separate identity between the stated capital and the loan account of $200,000. In fact, the stated capital owes its very existence to the loan account.

In 1939, the $200,000 special stockholders' account was transferred to the special account. Petitioner contends that the special stockholders' account was liquidated at that time and that the stockholders then chose to reloan the money to petitioner. However, aside from the resolution passed at a meeting of the stockholders in 1939, there is no record of the amounts being distributed in fact to the interested parties, but there was merely an entry on the books whereby the special account was credited and the special stockholders' account was debited. It is significant that petitioner made these entries only after respondent had examined its books and questioned the claimed interest payments on the $200,000. Moreover, the proportionate interest of stock to the original loan, now part of the special account, continued following the bookkeeping changes in 1939. For every share of stock held, there remained $800 in the special account to the account of the particular stockholder.

In 1943, petitioner converted the special account to the bills payable account at the advice of its accountant. For the first time, notes were made reflecting the amounts in the account. These notes bore a stated rate of interest, and a maturity date of 1 year from the date they were made. However, these notes remained in the possession of

the petitioner, and no nonstockholder saw them, although some knew of their existence. At the end of each year, either the notes were marked paid by one of petitioner's officers and new notes issued for the same amount, or the old notes were simply renewed. These transactions were accomplished without the concurrence of those, other than stockholders, owning interests in the bills payable account. The interest rate actually varied from year to year and this variation took into consideration the earnings of the business during the year prior to the date the notes were made. In 1952 the notes were altered by the petitioner, 2 months before the payment date, without conferring with the persons who held interests in the bills payable account, so as to increase the amount of interest payable at the maturity date of the notes. The similarity of this action to the declaration of an extra, or year-end, dividend seems more than coincidental.

We note that the account of Sarah A. Farnsworth in the bills payable account during the years 1948–1954 did not have $800 for each share of stock held by Sarah A. Farnsworth or her estate. The account did have at least $709.22 for each share of stock owned by Sarah A. Farnsworth or her estate. However, Grace Phillips, the daughter of Sarah A. Farnsworth and the individual who conducted the business affairs of her mother, had sufficient amounts to her own credit in the account to equal the required $800. Grace Phillips was a member of the board of directors from 1941 through the years in question, although she was not an actual stockholder until 1955 when stock was transferred to her account from her mother's estate. Under these circumstances and in view of the great weight of the other evidence, the fact of Sarah A. Farnsworth's somewhat disproportionate interests, is insufficient to alter our conclusion that the $200,000 represented equity capital.

As we have found, from 1915 through the years in question, amounts were deposited with petitioner in addition to the original $200,000 and some of these amounts were placed to the credit of persons other than stockholders. However, the only nonstockholders having such credits were members of the Farnsworth and McPherson families, these two families controlling at least two-thirds of the corporate stock at all times. Aside from the absence of voting rights and participation in management, there were no distinctions between the $200,000 account and the special account. However, the lack of voting rights and participation in management is also common to certain kinds of stock. *Green Bay & Western Railroad Co.*, *supra; Commissioner* v. *H. P. Hood & Sons*, 141 F. 2d 467 (C.A. 1, 1944), affirming *H. P. Hood & Sons, Inc.*, a Memorandum Opinion of this Court filed December 2, 1942. When the special stockholders' account and the special account were combined in 1939, it did not affect the

nature of the special account any more than it did the nature of the amounts previously in the special stockholders' account. The issuance of the notes on the bills payable account in 1943 likewise did not affect the nature of the account, since there were no changes as to control, rights to interest and recovery, or as to true maturity date. As was the case with respect to the original $200,000, the rate of interest varied from year to year at the discretion of the board of directors who took into account the petitioner's earnings in fixing the rate. We are satisfied that the effect of the written notes, the stated maturity dates, interest rates, and the disproportionate interest of stock to the bills payable account served only to disguise the true nature of the amounts in that account. The amounts held by petitioner in the bills payable account, above the original $200,000 capital of the corporation, represent additional capital, and were at the risk of the business.

The amounts paid on the bills payable account during the years in question constituted dividends and not deductible interest.

### *Issue 2.*

Respondent has determined that petitioner realized $840 interest income in 1953 on the $14,000 outstanding loan to the estate of Sarah A. Farnsworth. Petitioner argues that it did not charge any interest to the estate and is not required to do so for income tax purposes. *Combs Lumber Co.*, 41 B.T.A. 339 (1940). Nor is it required to accrue interest, where there existed an understanding that none would be charged, even though there existed a note bearing a stated interest rate. *Society Brand Clothes, Inc.*, 18 T.C. 304 (1952). However, here there was no note, and we conclude, consistent with the rest of this opinion, that the $14,000 represented simply a withdrawal of capital, later reinvested. This being the case, petitioner is not chargeable with having realized interest income on that amount.

*Decision will be entered under Rule 50.*