James D. Lancaster and Marian W. Lancaster v. Commissioner. Harry C. Garner and Susan G. Garner v. Commissioner.
Lancaster v. Commissioner
Docket Nos. 93976, 94512.
United States Tax Court
T.C. Memo 1964-108; 1964 Tax Ct. Memo LEXIS 225; 23 T.C.M. (CCH) 631; T.C.M. (RIA) 64108; April 24, 1964
*225 Upon its organization, petitioners and other stockholders paid $1,000 for all the capital stock of a corporation organized to acquire, subdivide, develop, and sell real estate, and also paid to the corporation $25,000, in direct proportion to their stockholdings, for which they received promissory notes. Held, the $25,000 paid to the corporation represented equity capital rather than loans to the corporation and respondent's determination, that amounts paid to petitioners by the corporation as repayments of loans, and interest thereon, were taxable as dividends, is sustained. James D. Lancaster, 216 Claremont Dr., Gadsen, Ala., for the petitioners. Robert G. Faircloth, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings respondent determined a deficiency in the income tax of petitioners James D. and Marian W. Lancaster for the year 1958 in the amount of $148.40, and in the income tax of petitioners Harry C. and Susan G. Garner for the years 1958 and 1959 in the amounts of $214.08 and $218.88, respectively. The only issue is whether certain payments received by petitioners in the years involved from Argyle Hills, Inc., a corporation in which petitioners were stockholders, were repayments of bona fide loans and interest thereon, or were dividends. Findings of Fact Most of the facts were stipulated and are so found. Petitioners James D. and Marian W. Lancaster are husband and wife residing at 216 Claremont Drive, Gadsden, Ala. Petitioners Harry C. and Susan G. Garner are husband and wife residing at 313 Azalea Drive, Gadsden, Ala. All returns for the taxable years involved were filed with the district director of internal revenue at Birmingham, *227 Ala.
Petitioners Harry C. Garner and James D. Lancaster (hereinafter called Garner and Lancaster, respectively), during the years involved, were directors and stockholders and were president and secretary-treasurer, respectively, of Argyle Hills, Inc. (hereinafter referred to as Argyle). Argyle was organized under the laws of Alabama on January 9, 1958, for the purpose of acquiring, developing, subdividing, and selling real estate lots. Its authorized capital stock was 1,000 shares with a par value of $1 per share. Garner, Lancaster, and Gordon L. James, as incorporators, subscribed for all the capital stock; Garner for 940 shares, Lancaster for 20 shares, and James for 40 shares. Stock certificate No. 1, representing Garner's 940 shares, was canceled before payment therefor and the 940 shares were issued to various individuals on the dates and in the amounts as follows: Certifi-
Date Is-
cate
sued -
No.
Name
Shares
1958
4
G. W. Leach, Jr.
40
1/10
5
Jack Floyd
20
1/10
6
Alton H. Powell
100
1/10
7
Susan G. Garner
20
1/11
8
A. L. Wagnon
20
1/11
9
Bill Maulding
100
1/22
10
Lookout Land Co., Inc.
320
1/23
11
Paul F. and Audrey B.
Schnabel, Jr. [1]
20
2/ 3
12
Harry C. Garner
40
2/14
13
Jack L. Ray
20
2/14
14
Corley W. Odom
40
2/14
15
Westbrook Finlayson
10
2/15
16
C. Walter Pyron
10
2/18
17
James B. Allen
5
2/18
18
James B. Allen, Jr.
5
2/18
19
Hoyt D. and Jewell S.
Edwards
40
2/27
20
Charles Watts
20
3/14
21
James Watts
20
3/14
22
Aleck Greenwood [1]
40
4/24
23
The Gadsden Corporation
50
5/ 6
*228 On January 15, 1958, each of the stockholders paid over to Argyle certain funds, totaling $25,000 and equal individually to 25 times the par value of their stock, and received promissory notes in like amount from Argyle in exchange therefor, payable 4 years after date with interest at 8 percent. These notes were issued to the stockholders, in the amounts, and were paid in full by Argyle, as follows: Date
note
Note
paid in
No.
Name
Amount
full
1-A
Lookout Land Co., Inc. [1]
$8,000
6/ 1/61
2
Alton H. Powell
2,500
5/14/59
3
Jack Floyd
500
6/29/59
4
Gordon James
1,000
6/29/58
5
Susan G. Garner
500
3/17/59
6
A. L. Wagnon
500
3/17/59
7
Bill Maulding
2,500
5/ 9/59
G. W. Leach, Jr. [2]
1,000
2/13/59
8
Paul F. and Audrey G.
Schnabel [1]
500
5/18/59
9
Harry C. Garner
1,000
9/12/58
10
James D. Lancaster
500
10/18/58
11
Jack L. Ray
500
6/29/59
12
Corley W. Odom
1,000
10/18/58
13
Westbrook Finlayson
250
6/29/59
14
Walter Pyron
250
5/23/59
15
James B. Allen
250
5/23/59
16
Hoyt Edwards
1,000
6/29/59
17
Charles and James Watts
1,000
4/ 9/59
18
Alex Greenwood [1]
1,000
3/17/59
19
The Gadsden Corporation
1,250
11/ 3/58
*229 On January 22, 1958, Argyle entered into a contract for the purchase of a tract of land from Lookout Land Co. (hereinafter referred to as Lookout) for $59,000, payable $1,000 cash down and the balance of $58,000, evidenced by notes from Argyle to Lookout, as follows: $12,500.00 due
1 year from contract date with
interest at 4%.
$12,500.00 due
2 years from contract date with
interest at 4%.
$12,500.00 due
3 years from contract date with
interest at 4%.
$12,500.00 due
4 years from contract date with
interest at 4%.
$ 8,000.00 due
4 years from contract date with
interest at 8%.
Argyle did not receive legal title to the land, but Lookout agreed to convey individual lots to Argyle, or its order, upon the payment of $1,000 cash for each lot sold until the entire purchase price was paid, at which time Lookout would convey the remaining lots in the tract to Argyle. It was further agreed that if Argyle defaulted in the payment of any note when due, 10 days after such default Lookout, at its option, could cancel *230 the contract of sale and Argyle would forfeit any improvements which had been made upon the land. Argyle used the $1,000 received for its stock to make the downpayment under the contract to Lookout and used the $25,000 paid in by the stockholders in exchange for notes to subdivide and develop the property. The venture was successful and all the lots in the first subdivision were sold within a little more than a year's time. All the notes issued to the stockholders were paid in full before they were due and all interest thereon was paid when due. Proceeds from the sale of lots were first used by Argyle to pay the installment obligations to Lookout and the remaining proceeds were used to pay off the notes issued to the stockholders. On October 12, 1958, Lancaster and Corley W. Odom entered into an agreement to purchase seven of the above lots from Argyle and as part of the purchase price, they canceled their notes from Argyle of $500 and $1,000, respectively. One $1,000 note of Argyle held by Garner was paid in cash in 1958 and another $1,000 note of Argyle held by the Garners was paid in cash in 1959. [2]
*231 Lancaster received $40 from Argyle in 1958 which he reported as interest income on his 1958 return. The Garners received $160 from Argyle in 1958, in addition to the cash received on payment of the note, $120 of which Garner reported as business income in 1958. Respondent determined that Lancaster received a dividend of $540 from Argyle in 1958, representing the $500 note applied against the purchase price of the seven lots and the $40 reported as interest, increasing Lancaster's dividend income by $540 and decreasing his interest income by $40. Respondent determined that the Garners received dividends of $1,160 from Argyle in 1958, increasing their dividend income in that amount and decreasing their business income by $120. Respondent also determined that the Garners received dividends of $1,000 from Argyle in 1959, none of which they had reported on their returns. Opinion Respondent determined that the amounts received by petitioners from Argyle in the years involved were dividends. Petitioners claim that the amounts received were repayments of bona fide loans made by them to Argyle, plus interest thereon. Respondent's determination is presumptively correct and the burden *232 of proof is on petitioners. Rule 32, Tax Court Rules of Practice.
The basic issue is whether the payments made by petitioners to Argyle, for which they received Argyle's promissory notes, may be considered for tax purposes as bona fide loans, the repayments of which would not be taxable income to petitioners, or must be considered for tax purposes as contributions of capital to Argyle, so that repayments thereof, to the extent paid out of earnings and profits, [2] will be considered dividends, as defined in section 316, I.R.C. 1954, includible in gross income under section 301(c)(1) of the Code. This in turn depends on whether the advances by the stockholders to the corporation in fact constituted investments of equity capital or loans, which must be determined from the facts shown by the evidence in each case. McSorley's Inc. v. United States, 323 F. 2d 900 (C.A. 10, 1963); Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002 (1959); Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari *233 denied 352 U.S. 1031 (1957). This and other courts have often been faced with so-called "thin-capitalization" cases, usually involving questions of whether losses sustained by the stockholders for advances to the corporation are deductible as ordinary losses or capital losses, or whether payments made by the corporation to the stockholders are deductible as interest or are nondeductible dividends, neither of which questions we have here because the corporate venture was successful and the corporation is not before us. Out of these cases the courts have derived numerous criteria for determining whether advances by stockholders to corporations are contributions of risk capital or bona fide loans, see Wilbur Security Co., 31 T.C. 938 (1959), affd. 279 F. 2d 657 (C.A. 9, 1960), but it would be of little value to repeat them here because we do not have sufficient evidence upon which to apply many of the tests. The only evidence *234 presented was a stipulation of facts and the oral testimony of Lancaster, and we have made an effort to include in our Findings of Fact all pertinent facts which can be gleaned from those sources. These give us very little insight into the subjective intent or thinking of the parties or the actual financial condition of the corporation and its credit rating, so our conclusions must be arrived at without the benefit of tests based on such facts. From the evidence we do have it appears that the payments by the stockholders to the corporation on January 15, 1958, with which we are here concerned were cast in the form of loans. At least Argyle issued its promissory notes to the stockholders equal in face amount to the amount advanced by each stockholder. We assume that these amounts were recorded on Argyle's books as notes payable - although there is no evidence to support this assumption. It is stipulated that the notes had a fixed due date, 4 years after January 15, 1958. Lancaster testified that the notes had priority over the stock, but the evidence is that the first $1,000 received from the sale of each lot had to be paid to Lookout before the sale could be completed. We do not *235 know the relative priority of these notes with other possible creditors of the corporation, and even if we accept Lancaster's statement that the notes had priority over the stock, this means little or nothing when the stockholders all received notes in direct proportion to their stockholdings. Lancaster testified that the notes bore interest at the rate of 8 percent and that all interest was paid. While the obligation to pay interest regardless of profits is one of the characteristics of a loan, we do not know what would have happened here had the corporate venture not been successful and other creditors had pressed claims. It is at least clear that the obligation to Lookout had to be met first because Argyle could not operate unless Lookout released the lots. There was apparently no security for the payment of the stockholders' notes and the rate of interest suggests either that there was considerable risk involved or that profits might be paid over to the stockholders in a form deductible by the corporation. In any event, the form alone in which a transaction is cast between related parties is not controlling for tax purposes. Gregory v. Helvering, 293 U.S. 465 (1935); *236 Gooding Amusement Co., supra; Wilbur Security Co., supra. In this situation the controlling factor is whether the payments made by the stockholders to the corporation were in substance and reality equity capital put at the risk of Argyle's business. If so, and absent any evidence of liquidation of the corporation, the distributions or repayments here involved must be considered dividends. Aside from the form given the transactions, the payments by the stockholders to the corporation had many of the indicia of investments of equity capital. The corporation was organized with and issued only the very minimum capital stock, the proceeds from which were clearly nowhere near sufficient to pay for the acquisition and development of the property, which was the purpose for its organization. The payments received from the stockholders were used to subdivide and develop the property, being in the nature of capital expenditures. The ratio of Argyle's capital stock to the stockholders' notes alone was 25 to 1, and the ratio of its capital to debt after it purchased the property appears to have been 83 to 1. As Lancaster testified, the $25,000 advanced was at the risk *237 of the business as well as the $1,000 paid in for the stock. The noteholders could look only to the earnings and profits of the business for payment of interest on and repayment of the advances, because there were no assets available for same except the lots, when and as released by Lookout, and the $1,000 capital they themselves had paid in. And Lancaster also testified that no bank would have loaned the corporation $25.000 under the same circumstances. In Isidor Dobkin, 15 T.C. 31 (1950), affd. 192 F. 2d 392 (C.A. 2, 1951), where the facts were quite similar to the facts here, this Court said: Ordinarily contributions by stockholders to their corporations are regarded as capital contributions that increase the cost basis of their stock, thus affecting the determination of gain or loss on ultimate dispositions of the stock. Harry Sackstein, 14 T.C. 566. Especially is this true when the capital stock of the corporation is issued for a minimum or nominal amount and the contributions which the stockholders designate as loans are in direct proportion to the shareholdings. Edward G. Janeway, supra. See also Edward G. Janeway, 2 T.C. 197 (1943), *238 affd. 147 F. 2d 602 (C.A. 2, 1945); McSorley's Inc. v. United States, supra. Petitioners argue that there was a business purpose for organizing the corporation with a minimum capital and lending it the necessary funds to get started in business, being to save charter, capital stock assessment, and other State and local fees and taxes. Such objective may be perfectly legitimate and acceptable in corporate business practice but it alone will not control the character of the stockholders' investments in the corporation for Federal tax purposes. We are somewhat reluctant to tax these payments to petitioners in cases such as these, where we do not have the usually concurrent problem of deductible interest v. nondeductible dividends at the corporate level, nor the question of business loss v. capital loss at the stockholder level, because these petitioners should be entitled to a return of their investment, at some time or another, tax free. But no claim has been made that any part of the payments made by the corporation to these petitioners was a return of capital, and furthermore we could not treat the stockholders' contributions to the corporation as bona *239 fide loans for one purpose and as equity capital for another purpose. We believe the weight of the evidence characterizes the payments by the stockholders to the corporation as investments of equity capital rather than bona fide loans, but more important we conclude without hesitation that petitioners have failed to carry their burden of proving that the payments by the corporation to them were not dividends as determined by respondent, so we must hold in favor of respondent. See Gooding Amusement Co., supra. We do not believe the cases cited and relied upon by petitioners lay down any principles inconsistent with those we have used in reaching our conclusion here, although they at times reached different conclusions based on different facts. The issue here involved must be decided on the particular facts of each case. This principle is recognized in Rowan v. United States, 219 F. 2d 51 (C.A. 5, 1955), and other cases cited by petitioners as well as in the cases cited herein. Decisions will be entered for the respondent. Footnotes
1. As stipulated.↩
1. No cash paid in to Argyle for this note. Per notice of deficiency and petition. There is no explanation in the record how the Garners acquired the additional $500 note, notes totaling only $1,500 having been issued to them in January 1958.
[2]↩ This amount paid in to Argyle in the form of a note due Leach from Gadsden Development Co., Inc
2. No evidence was presented to show the earnings and profits of Argyle, so we must assume, based on the presumptive correctness of respondent's determination, that earnings and profits were available to make the payments.↩