E. W. McGah and Lucille McGah v. Commissioner.
McGah v. Commissioner
Docket No. 83532.
United States Tax Court
T.C. Memo 1961-157; 1961 Tax Ct. Memo LEXIS 189; 20 T.C.M. (CCH) 783; T.C.M. (RIA) 61157; May 31, 1961
Stacy H. Dobrzensky, Esq., for the petitioners. Donald G. Daiker, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency in the income tax of petitioners has been determined by the respondent for the taxable year 1956 in the amount of $7,100. The only issue for decision is the correctness of the respondent's action in increasing the taxable income of the petitioners by an amount of $10,000 as a corporate dividend received. Findings of Fact Facts which have been stipulated are so found. The petitioners are husband and wife and reside in Orinda, California. They filed their joint income tax return for 1956 with the director at San Francisco, California. The wife is involved herein only because she joined in filing the joint return. The *190 husband sometimes hereinafter will be referred to as the petitioner. In 1933 Hughes, Miller, and Manning organized a corporation by the name of Charles S. Hughes, Incorporated, to conduct a building materials business in Berkeley, California. Shortly after the corporation began business Hughes died and his stock in the corporation passed to his widow. Following Hughes' death, H. W. Gentry, who theretofore had been employed by the corporation as a salesman, was employed by the corporation as its manager. The corporation was operated successfully until August 31, 1943, when it was dissolved and liquidated. At or about the time the corporation was dissolved, a partnership, consisting of Miller with a two-fifths interest, Manning with a two-fifths interest, and Gentry with a one-fifth interest, was formed to carry on under the name of Charles S. Hughes Company the building materials business theretofore conducted by the corporation. The partnership began business on September 1, 1943, and continued in business until May 31, 1953, when certain transactions hereinafter set forth occurred. Throughout the period September 1, 1943, to May 31, 1953, the partnership's operations were profitable. *191 On May 31, 1953, the partnership, incidental to the selling of building materials, owned and operated a number of trucks, largely for the purpose of mixing and delivering cement, and also owned a comparatively small amount of machinery and equipment which it used to manufacture asphalt which it also sold. By 1952, Miller and Manning because of their advanced ages were desirous of retiring from the partnership of which Gentry was and had been the manager. For a number of years the petitioner had been engaged successfully in business as a tile contractor and in the business of purchasing tracts of land, subdividing them, erecting houses thereon and selling them. He had become acquainted with Gentry about 1940 and thereafter had transacted considerable business with him. By 1952 they had become good friends. During the latter part of 1952 Gentry informed the petitioner that Miller and Manning desired to dispose of their interests in the partnership and to withdraw therefrom but that he was not financially able to purchase their interests. He inquired whether the petitioner would go into business with him on a partnership basis or would make a loan to him to purchase the interests *192 of Miller and Manning. Since the petitioner then was and for a number of years had been engaged in business as a tile contractor and in the business of subdividing, developing, and selling tracts of land, and since he was not a young man, he was not interested in going into any new business and particularly a business which was primarily a selling operation as was the partnership business and which could be expected to continue for a long period in the future as he anticipated the partnership building materials business probably would do. Accordingly he informed Gentry that he was not interested in going into any new business venture but that he might help him financially. Thereafter on a number of occasions Gentry discussed the matter further with petitioner. Following these discussions the petitioner made an examination of and fully acquainted himself with the assets, operation, and business of the partnership. As a result of his examination and since his son, E. J. McGah, was interested in acquiring an interest in a business engaged in selling building materials, the petitioner informed Gentry that at his (petitioner's) age he did not desire to acquire an interest in a business *193 engaged in the sale of building materials but that he (petitioner) would lend him sufficient funds so that he (Gentry) could acquire the interests of Miller and Manning in the partnership; that petitioner's son was interested in acquiring an interest in a business engaged in selling building materials; and further that if the three phases of the partnership's business, namely, selling building materials, trucking, and asphalt, with the related assets, could be segregated or divided and profitably operated separately, he (petitioner) might become interested in acquiring an interest in the trucking and asphalt phases. An investigation disclosed that funds for financing trucking operations could be more easily obtained if such operations were conducted as a separate business than if conducted as an integral part of the building materials business. In view of that and since the petitioner's son was willing to acquire an interest in the phase of the business involving only the selling of building materials, it was decided that the petitioner and his son would purchase all the partnership assets, that three corporations would be organized, one to engage in the business of selling building *194 materials, one to engage in the trucking business, and the other to engage in the asphalt business, and that petitioner and his son would transfer the assets to the three corporations, the transfer to each corporation to be of assets requisite and appropriate for the conduct of the business for which the corporation was organized. After some appraisals of the partnership assets had been made by third parties at the request of the partnership, Miller and Manning fixed, and Gentry concurred therein, the amount of $488,575 as the selling price of the net assets of the partnership, which had a net book value of $410,115.66 as of May 31, 1953. Gentry's one-fifth interest in the selling price was $97,715. Because the assets included certain parcels of land situated in Walnut Grove and Berkeley, the petitioner was of the opinion that the assets had a value considerably in excess of the fixed selling price. On June 1, 1953, the petitioner and his son purchased the net assets of the partnership as of the close of May 31, 1953, for $488,575 payable as follows: a down cash payment of $97,715, with the remainder, $390,860, evidenced by a joint promissory note of the purchasers bearing interest *195 at the rate of 4 percent per annum, payable monthly, and providing for the payment of the principal thereof as follows: $97,715 on or before June 15, 1953 $58,500 on or before one year from date and a like sum during each of the 3 next following years making a total of four installments of $58,500 each $59,145 on or before 5 years from date. The terms of the sale required as security for payment of the note the execution and delivery by the purchasers of a first deed of trust and mortgage of chattels on the real estate, improvements, and plant facilities located in Walnut Grove, California. The down cash payment of $97,715 was made at the time the petitioner and his son purchased the assets and was furnished in equal amounts, $48,857.50 by each of them. At the same time they also executed and delivered to the partnership their interestbearing joint promissory note, dated June 1, 1953, in the principal amount of $390,860, payable over the period June 16, 1953, through June 1, 1958, as set out above. At the time the petitioner furnished the foregoing amount of $48,857.50 he had an understanding with Gentry that the amount was a loan by petitioner and was to be repaid to him *196 after the foregoing note of $390,860 to the partnership had been paid and it was Gentry's intention that if the petitioner was not otherwise repaid, he personally would repay the loan. As previously decided upon, three corporations, sometimes hereinafter referred to as Trucking, Asphalt, and Building, were organized to carry on separate businesses. On June 10, 1953, the McGahs (the petitioner and his son) transferred the trucking equipment and related assets purchased from the partnership at a cost of $105,405.02 to Trucking, which had been organized to engage in the trucking business. On the same day the McGahs transferred the asphalt machinery and equipment and a related asset purchased from the partnership at a cost of $20,226.48 to Asphalt which had been organized to engage in the asphalt business. Also, on the same day the McGahs transferred the remaining assets purchased from the partnership at a cost of $362,943.50 to Building which had been organized to engage in the sale of building materials. The assets so transferred to the respective corporations were transferred at the same amounts as their costs to the McGahs. On June 10, 1953, Gentry received $97,715 from the partnership *197 in payment for his one-fifth interest therein. On June 15, 1953, he paid $97,715 to Miller and Manning, the remaining members of the partnership. That payment represented the payment due on that date on the McGahs' note of June 1, 1953. In consideration for the aforementioned transfer of assets to it, on June 10, 1953, Building executed and delivered to the petitioner a note reading as follows: PROMISSORY NOTE Berkeley, California
$47,857.50 June 10, 1953 On or before six years after date, for value received, the undersigned promises to pay to E. W. McGAH or order, at Oakland, California, the sum of Forty Seven Thousand Eight Hundred Fifty Seven Dollars and Fifty Cents ($47,857.50), without interest. Said sum shall be payable in lawful money of the United States. If action be instituted on this note the undersigned promises to pay such sum as the court may fix as attorneys fees. H. W. GENTRY BUILDING MATERIALS CO. By /s/ H. W. Gentry / President Also, in consideration of the above-mentioned transfer of assets to it, Building executed and delivered to petitioner's son a note reading as follows: PROMISSORY NOTE Berkeley, California
$47,857.50 June 10, 1953 *198 On or before six years after date, for value received, the undersigned promises to pay to E. J. McGAH or order, at Oakland, California, the sum of Forty Seven Thousand Eight Hundred Fifty Seven Dollars and Fifty Cents ($47,857.50), without interest. Said sum shall be payable in lawful money of the United States. If action be instituted on this note the undersigned promises to pay such sum as the court may fix as attorneys fees. H. W. GENTRY BUILDING MATERIALS CO. By /s/ H. W. Gentry / President In partial consideration of the above-mentioned payment of $97,715 made by Gentry on June 15, 1953, to Miller and Manning on the McGahs' note dated June 1, 1953, which they had executed to the partnership, Building executed and delivered to Gentry a note reading as follows: PROMISSORY NOTE Berkeley, California
$95,715.00 June 10, 1953 On or before six years after date, for value received, the undersigned promises to pay to H. W. GENTRY or order, at Berkeley, California, the sum of Ninety Five Thousand Seven Hundred Fifteen Dollars ($95,715.00), without interest. Said sum shall be payable in lawful money of the United States. If action be instituted on this note the undersigned *199 promises to pay such sum as the court may fix as attorneys fees. H. W. GENTRY BUILDING MATERIALS CO. By /s/ H. W. Gentry / President Additionally, E. J. McGah and Gentry each received from Building $1,000 and 500 shares of its common stock, which constituted all its then issued and outstanding stock. Further, in consideration of the transfer of assets to them, Trucking, Asphalt, and Building on June 10, 1953, executed and delivered promissory notes payable to the McGahs totaling $293,145, with interest at the rate of 4 percent per annum in the amounts and due on the dates set out below. Each of the notes was paid, with interest, by the date indicated below: Date of
Note
Amount
Paid by
Note
Executed by
Date Due
of Note
June
1953
June 10
Trucking
1 year after date
$58,500.00
1954
June 10
Trucking
2 years after date
46,905.02
1955
June 10
Asphalt
2 years after date
11,594.98
1955
June 10
Asphalt
3 years after date
8,631.50
1955
June 10
Building
3 years after date
49,868.50
1956
June 10
Building
4 years after date
58,500.00
1957
June 10
Building
5 years after date
59,145.00
1959 Each of the foregoing *200 notes was endorsed personally by petitioner, his son, and Gentry and delivered to the accountant for the partnership and held by him as collateral security for payment of the joint promissory note dated June 1, 1953, in the principal sum of $390,860, which the McGahs previously had executed to the partnership. Pursuant to the terms of sale of the partnership assets to the McGahs, Building, to which the Walnut Grove and Berkeley real properties had been transferred, executed thereon on June 10, 1953, a deed of trust to Miller and Manning. On or about June 10, 1953, the following purchases for cash of capital stock in Trucking and Asphalt occurred: The petitioner purchased stock in Trucking for $500 and stock in Asphalt for $250. E. J. McGah purchased stock in Asphalt for $250. Gentry purchased stock in Trucking for $250 and in Asphalt for $250. The McGahs entered into an arrangement with Building whereby that corporation agreed that all payments on the notes owing by it to the McGahs would be made directly to the partnership and the McGahs agreed that upon payment in full they would extinguish the obligation of Building to them on its notes. The McGahs entered into similar arrangements *201 with Trucking and Asphalt. Following the purchase of the partnership assets by the McGahs, formation of the three corporations and transfer of the assets to them, the issuance of interest-bearing and noninterest-bearing notes by the corporations, and the purchase and issuance of capital stock in them, the corporate structures were as follows: Asphalt
Assets: Net assets transferred
$ 20,226.48
Cash (sale of stock)
1,000.00
$ 21,226.48
Liabilities: Interest-bearing notes payable to McGahs
$ 20,226.48
Capital stock (1,000 shares): Petitioner (250 shares) $250
E. J. McGah (250 shares)
250
H. W. Gentry (250 shares)
250
T. H. Gentry [1] (250 shares)
250
1,000.00
$ 21,226.48
Trucking
Assets: Net assets transferred
$105,405.02
Cash (sale of stock)
1,000.00
$106,405.02
Liabilities: Interest-bearing notes payable to McGahs
$105,405.02
Capital stock (1,000 shares): Petitioner (500 shares) $500
H. W. Gentry (250 shares)
250
T. H. Gentry (250 shares)
250
1,000.00
$106,405.02
Building
Assets: Net assets transferred
$362,943.50
Less cash payments (to E. J. McGah and
H. W. Gentry)
2,000.00
$360,943.50
Liabilities: Interest-bearing notes payable to McGahs
$167,513.50
Noninterest-bearing notes payable to: Petitioner
$47,857.50
E. J. McGah
47,857.50
H. W. Gentry
95,715.00
191,430.00
Capital stock (1,000 shares): E. J. McGah (500 shares)
$ 1,000.00
H. W. Gentry (500 shares)
1,000.00
2,000.00
$360,943.50
*202 Upon the organization of Asphalt, Building, and Trucking, H. W. Gentry became president of each of them. He has continued to be president of Asphalt and continued to be president of Trucking until its dissolution and liquidation on January 5, 1959, and president of Building until its dissolution and liquidation on November 6, 1959. He also was manager of Building and he and his son managed the businesses of Trucking and Asphalt. As a result of the business connections and contacts he had made over the years he had been in business, the petitioner "steered" a substantial amount of business to Building. Because of his ability in this respect, he was employed by Building as an outside salesman on a salary during 1956 and later years and produced about as much business as any of Building's other salesmen. However, petitioner did not participate in the management of Building. In the conduct of his tile contracting and subdividing businesses, the petitioner transacted as much business as possible with Building, Trucking, and Asphalt. As the result of a heart attack suffered by H. W. Gentry and because of a price war that was being conducted by its competitors, *203 Building discontinued business and was dissolved and liquidated in 1959. Asphalt has continued in existence and at the time of the trial herein its assets were leased and the rental therefrom was its only income. The following is a statement of the taxable net income of Building for the indicated years and its earned surplus balances at the end of those years: 1954
1955
1956
1957
1958
Taxable net income
$14,084.92
$33,560.27
$81,014.03
$24,237.20
$119Loss,726.02
Earned surplus balance
(401.16)
21,066.81
48,723.99
74,056.94
Deficit
In 1956, Building paid the petitioner $10,000 and recorded the payment on its books as payment on the noninterest-bearing note dated June 10, 1953, for $47,857.50 which it had executed to the petitioner in consideration of the transfer of assets to it. In 1956, Building paid to H. W. Gentry $10,000 and recorded the payment on its books as payment on the noninterest-bearing note dated June 10, 1953, for $95,715 which it had executed to him in partial consideration of his payment of $97,715 made by him to Miller and Manning on June 15, 1953, on the note the McGahs had executed in acquiring the partnership assets. *204 In connection with its dissolution and liquidation in 1959, Building paid the petitioner $37,857.50 and H. W. Gentry $85,715 and recorded the payments as payments made on the foregoing notes dated June 10, 1953, which it had executed to petitioner and Gentry, respectively. Also, in connection with its dissolution and liquidation in 1959, Building paid E. J. McGah $37,857.50 and recorded that payment on its books as payment made on the noninterest-bearing note dated June 10, 1953, for $47,857.50 which it had executed to him in consideration of the transfer of assets to it. Following the foregoing payments made in connection with its dissolution and liquidation, Building paid a liquidating dividend to its stockholders as follows: $59,000.56 to H. W. Gentry and the same amount to E. J. McGah. In connection with its dissolution and liquidation in 1959, Trucking paid a liquidating dividend to its stockholders as follows: Petitioner
$143,924.69
H. W. Gentry
71,962.35
T. H. Gentry
71,962.74
The petitioner did not report as income in his income tax return for 1956 the abovementioned payment of $10,000 made to him in that year by Building. The respondent determined *205 that the amount constituted a dividend and was taxable as such to the petitioner and accordingly determined the deficiency in his income tax here involved. The noninterest-bearing note dated June 10, 1953, for $47,857.50 executed by Building to petitioner in consideration of the transfer of assets to it represented an indebtedness owing by Building to the petitioner and the payment of $10,000 made by Building to the petitioner in 1956 constituted payment in part by Building of that indebtedness. Opinion As stipulated by the parties, the respondent's contention is that the $10,000 paid by Building to petitioner in 1956 constituted income to him taxable as a corporate dividend, and the petitioners' contention is that the amount was in fact a partial repayment of a loan. The contentions of the parties present the basic question of whether the promissory note for $47,857.50, dated June 10, 1953, which Building issued to petitioner in consideration for the transfer to it of assets which he and his son had purchased from the partnership, represented a bona fide debtor-creditor relationship resulting from the transfer or, in reality and irrespective of form, represented an equity capital *206 investment by petitioner in Building. The parties properly are in agreement that that question is one of fact to be determined on the facts in the case. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946); and Wilbur Security Co., 31 T.C. 938 (1959), affd. 279 F. 2d 657 (C.A. 9, 1960). Under the decided cases, some of the usual tests to be applied in making a determination of the question are: the name given to the instrument evidencing the indebtedness, the presence or absence of a maturity date, the source of the payments, the right to enforce payment of the indebtedness, participation in management, status with respect to regular corporate creditors, intent of the parties, capitalization, identity of interest between creditor and stockholders, and payment of interest only out of dividends. Wilbur Security Co., supra, and cases there cited. In 1952 and the first half of 1953, H. W. Gentry's partners, Miller and Manning, each owned a two-fifths interest in the partnership which was conducting a profitable business in the sale of building materials. Because of their advanced ages they were desirous of disposing of their interests *207 in that partnership and withdrawing therefrom. Gentry had spent 20 years in the conduct of the business, most of the time as manager, but owned only a one-fifth interest in the partnership. He was desirous that the business be continued and wished to continue his connection with it but was not financially able to purchase the interests of Miller and Manning. If they should sell their interests to a stranger or strangers, Gentry was faced with the possible loss of all connection with the business. In that situation it was only natural that he should take steps directed toward the continuance of the business and his connection with it. Since he and petitioner had been business acquaintances for a number of years and were good friends and since the petitioner was a successful businessman and a man of substantial means, it also was only natural that he would approach petitioner about the situation facing him. Because of his age, the businesses he was operating, and the responsibility that would be involved in joining Gentry in a partnership to take over and operate the business then conducted by Gentry and his partners, the petitioner was not interested in participating in the business *208 with Gentry. Because of the situation facing him Gentry was persistent but throughout Gentry's persistence the petitioner maintained his position that he did not desire to acquire an interest in a business that was engaged in the selling of building materials or in that portion of the partnership business which was involved in the sale of building materials. After the petitioner found that the business and assets of the partnership were susceptible of being segregated into three natural divisions - selling building materials, trucking, and asphalt - he finally deviated from his previous position to the extent that he agreed to acquire an interest in the trucking and asphalt divisions. Thus, out of his willingness to accommodate and assist Gentry, the petitioner joined with his son in purchasing the partnership assets on June 1, 1953, furnished one-half of the down payment thereon, pledged his credit for the remaining installment payments thereon extending over a period of 5 years or until June 1, 1958, accepted as security for his pledge the unsecured notes of three corporations formed to take over separate portions of the business and assets of the partnership and, along with his *209 son and Gentry, endorsed the notes and deposited them as security for payment of the installment payments and became a stockholder in two of the corporations, Trucking and Asphalt. The respondent contends that there was no business reason for the organization of the three corporations - Building, Trucking, and Asphalt - to carry on the business previously conducted by the partnership as a single business. However, the respondent has not cited us to any law, court decision, or regulations, and we know of none which require that in a situation such as that presented here the purchasers of the assets and business of a partnership are required to continue the business and employ the assets as a single business enterprise as the partnership had done or are prohibited from dividing the business and assets and transferring the assets as divided to separate corporations which operate and conduct separate businesses as separate corporate entities as was done in the instant case. The respondent points us to nothing in the record and we find nothing to indicate that the division of the business and assets was other than a natural division or that there was an arbitrary and haphazard allocation *210 of assets between the divisions or that after the division and allocation there was any intermingling or allocation between the three corporations of their respective assets and incomes. The three corporations were organized to and did conduct three separate and distinct businesses and that at least Building and Trucking did so profitably is evidenced by the stipulated facts. This is not a case in which the respondent has applied section 482 of the Internal Revenue Code of 1954 which provides for the allocation of income and deductions among taxpayers nor does respondent contend that that section is applicable here. As respondent concedes the evidence shows that Trucking was organized because funds for its operations were more readily obtainable by the conduct of those operations as a separate business than if such operations had been conducted as part of the business of selling building materials. Asphalt was organized because of petitioner's willingness to assist Gentry by acquiring an interest in the business conducted by it. In his arguments in support of his determination that the payment of $10,000 made to petitioner in 1956 by Building was taxable as *211 a dividend to the petitioner, the respondent broadly views the three corporations as an aggregate and applies to the aggregate the tests he deems pertinent. The petitioner, on the other hand, takes the position that since the payment in question was made only by Building, in which he owned no stock, the pertinent tests should be considered only with respect to Building. Since Building was a separate and distinct corporation with its own separate business and assets from Trucking and Asphalt, which had their respective businesses and assets and had stockholders other than those who were stockholders of Building, and in view of the fact that there is no showing or contention that Trucking or Asphalt provided any portion of the payment in question or otherwise participated in the payment or profited therefrom, and since the question before us is whether the $10,000 here in volved was a dividend paid by Building to petitioner or a partial payment by Building to petitioner of an indebtedness owing by it to him, we think we are without a basis for treating the three corporations as an aggregate and thereby equate petitioner as a stockholder in Building as the respondent attempts to do. *212 As respondent contends, Building had a small capital stock, $2,000, represented by 1,000 shares which were owned in equal amounts by petitioner's son and H. W. Gentry. Building acquired that portion of the partnership assets which were pertinent and requisite for the conduct of the business of selling building materials. Of the net assets which the partnership sold for $488,575, Building acquired assets in the amount of $362,943.50, payments for which were not to begin until June 1956 and continue to June 1959. Included in the assets it acquired were material inventories of approximately $95,000 and accounts and notes receivable of an excess of $188,000 over accounts and notes payable (exclusive of the notes executed to the McGahs and H. W. Gentry). Having acquired what in effect was a profitable going business with its assets on such favorable credit terms and since the assets included such substantial amounts of inventory and accounts and notes receivable, there is no indication in the record that Building ever needed or obtained any loans for financing its day-to-day operations. Although the petitioner by reason of business connections and contacts and with negligible effort *213 "steered" a substantial amount of business to Building and, because of his ability in that respect, was employed by Building in 1956 and the following years as an outside salesman, he did not participate in the management of Building. Except for the fact that it was noninterest-bearing, Building's note of June 10, 1953, to petitioner was in form an ordinary negotiable promissory note for a stated amount, payable on or before a date fixed therein. Neither the note nor anything else of record indicates that funds for payment of the note were to be obtained or to be derived by Building from any specified source. The source of such funds was not limited in any particular and certainly not to the earnings and profits of Building or to dividends paid by it. The note in question was issued by Building to petitioner in consideration of the transfer to it of assets which petitioner and his son had purchased from the partnership, the down payment on the purchase price of which was furnished in equal amounts by petitioner and his son. The evidence shows that at the time the petitioner furnished his part of the down payment he had an understanding with H. W. Gentry that that amount was a loan *214 by petitioner and was to be repaid to him after the partnership had been paid for the assets purchased from it. The evidence further shows that it also was Gentry's intention that if the petitioner was not otherwise repaid, he himself would repay the petitioner. Since Building throughout the entire time from the issuance of the note until its dissolution and liquidation on November 6, 1959, carried the note on its books as an indebtedness owing by it to petitioner and in its liquidation paid as an indebtedness owing to him the amount of $37,857.50, the balance of the note remaining after the payment in 1956 of $10,000, which is here in controversy, we think it is apparent that Building's action in the matter was in full conformity with the understanding between the petitioner and Gentry and was the means by which that understanding was fully carried out. From our consideration of all the facts we have concluded that the note represented an actual debt of Building to petitioner; that the note was in substance what it appears to be on its face; and that the payment by Building of $10,000 to petitioner in 1956 constituted a partial retirement of an actual note indebtedness and was not *215 income to petitioner. Decision will be entered for the petitioners. Footnotes
1. Son of H. W. Gentry.↩